**David B. Owens** (SBN 275030)
**Megan Pierce** (SBN 314044)
**Jon Loevy**, IL Bar: 6218254*
**Steven Art**, IL Bar: 6302319*
**Wallace Hilke**, IL Bar: 6329814*
david@loevy.com
megan@loevy.com
jon@loevy.com
steve@loevy.com
hilke@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902

**Pro hac vice admission pending*

**Michael D. Seplow** (SBN 150183)
**Paul Hoffman** (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
Schonbrun Seplow Harris
Hoffman & Zeldes LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

*Counsel for Plaintiffs,*
*JOFAMA COLEMAN AND JOCELYNE COLEMAN.*

**UNITED STATES DISTRICT COURT FOR**
**THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOFAMA COLEMAN and JOCELYNE COLEMAN,<br><br>Plaintiffs,<br><br>v. | Case No.: 5:24-cv-02685<br><br>**COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED** |

| | |
|---|---|
| LOS ANGELES SHERIFF'S DEPARTMENT; COUNTY OF LOS ANGELES; STEPHEN KATZ; DANNY SMITH; MICHAEL VALENTO; MARK LILLIENFELD; CYNTHIA VALENCIA; NORMAN POWELL; AND DANIEL ROSENBERG; and UNIDENTIFIED EMPLOYEES of the COUNTY OF LOS ANGELES AND THE LOS ANGELES SHERIFF'S DEPARTMENT,<br><br>Defendants. | **42 U.S.C. § 1983: Fourth and Fourteenth Amendments, Failure to Intervene, Conspiracy to Deprive Constitutional Rights, Monell, Right to Familial Association.** |

Pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1367, Plaintiffs Jofama Coleman and Jocelyne Coleman, by their undersigned attorneys, complain of Defendants, the LOS ANGELES SHERIFF'S DEPARTMENT (the "Department" or "LASD"); LOS ANGELES COUNTY; STEPHEN KATZ; DANNY SMITH; MICHAEL VALENTO; MARK LILLIENFELD; CYNTHIA VALENCIA; NORMAN POWELL; AND DANIEL ROSENBERG; and UNIDENTIFIED EMPLOYEES of the LOS ANGELES SHERIFF'S DEPARTMENT, and state as follows:

**INTRODUCTION**

1. On May 10, 2003, Jose Robles, a teenager residing in south Los Angeles, was shot and killed in a drive-by shooting.

2. Defendants decided to fabricate and suppress evidence to illegitimately "solve" the crime and implicate Jofama Coleman ("Coleman") and Abel Soto, who were entirely innocent of Robles's murder.

3. The Los Angeles Sheriff's Department blessed the corrupt investigation by allowing Defendants to suppress evidence and by failing to supervise the homicide investigators, among other unlawful practices.

4. Defendants' efforts succeeded, and Coleman and Soto were wrongly convicted for Jose Robles's murder. As a result, each spent nearly two decades incarcerated for crimes they did not commit before they were exonerated

5. Coleman will never regain the foundational years of his life stolen from him on account of Defendants' misconduct. This lawsuit seeks redress for his injuries.

6. In addition, Plaintiff Jocelyne Coleman ("Jocelyne") was born to Jofama Coleman in 2004. Because of Defendants' misconduct, she grew up with her father in jail and prison for a crime he did not commit from the time she was an infant until after she became an adult. This suit seeks redress for her injuries as well.

## JURISDICTION AND VENUE

7. This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Coleman and Jocelyne's rights secured by the United States Constitution.

8. This court has jurisdiction of Coleman and Jocelyne's federal claims pursuant to 28 U.S.C. § 1331.

9. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred here, and most parties live here or are affiliated with this District.

## THE PARTIES

10. Plaintiffs Jofama Coleman and Jocelyne Coleman reside in the Los Angeles area.

11. At all relevant times, Defendants Stephen Katz, Danny Smith, Michael Valento, Mark Lillienfeld, Cynthia Valencia, Norman Powell, and Daniel Rosenberg (together, "Defendant Officers") were law enforcement officers employed by the Los Angeles Sheriff's Department and the County of Los Angeles. All are sued in their individual capacities.

12. Defendants Los Angeles Sheriff's Department and County of Los Angeles are California municipal entities. They are or were the employers of each individually named Defendant and the other Unidentified Officers. They are liable for all torts committed by the Defendant Officers pursuant to California law. They are also responsible for indemnifying judgments against the Defendant Officers. Finally, they are responsible for the policies, practices, and customs that caused Coleman and Soto's wrongful convictions.

**JOSE ROBLES IS MURDERED**

13. On May 10, 2003, around 9 p.m., Jose Robles was shot in a drive-by shooting on the 1100 block of West 101st Street in Los Angeles, California.

14. Robles died from his injuries.

15. Defendants Lillienfeld and Katz later issued a "special bulletin" seeking information on a vehicle in connection with the murder: a white van with wood paneling on both sides except for the driver's side door, which had been replaced.

**DEFENDANTS SINGLE IN ON COLEMAN AND HIDE EVIDENCE**

16. Defendants Katz, Smith, and Lillienfeld, homicide detectives with the Los Angeles Sheriff's Department, conducted the initial phase of the Robles murder investigation in the spring and summer of 2003. They interviewed numerous people who were present at the time Jose Robles was murdered, including Albert Segundo, who chased the shooter following the shooting; his brothers, Adrian, Anthony, and Jesse Robles; and Carlos Lopez.

17. According to the Defendant Officers' reports, Segundo told police that the driver and shooter might have been "Pelon" and "Willy" from the "Dog Pound Gangsters" and that the shooter was a Black male.

18. According to their reports, in a subsequent interview Segundo again indicated that the shooter was a Black male who resembled "Willie" from the Dog Pound Gang. This time, Defendants' reports indicate, Segundo allegedly claimed the driver was a Black male who resembled Jofama Coleman. According to the report, Segundo stated one of the victim's brothers had already said he believed the driver was Coleman.

19. According to the police reports, the Defendant Officers first interviewed Jesse Robles, another of the victim's brothers, two days after the murder on May 12, 2003. Defendants Katz and Lillienfeld obtained an "identification" of Jofama Coleman as the driver by using an obviously

inappropriate identification procedure: showing Jesse Robles a single photograph of Jofama Coleman. Katz and Lillienfeld knew that it was improper to attempt to obtain an identification of a suspect via a single photograph, but they did it anyways.

20. Defendant Officers, including Lillienfeld, interviewed Carlos Lopez, who claimed to have seen the vehicle driving away after the shooting. Defendant Officers falsified reports stating that Lopez told officers he saw "Jofama," but Lopez made no such statement.

21. The Defendant Officers spoke with Coleman on multiple occasions. Coleman truthfully and consistently maintained his innocence and had a strong alibi: he had spent the evening with his friends, his girlfriend, and her brothers, renting and watching movies and eating fast food. Multiple witnesses corroborated Coleman's innocence.

22. Defendant Officers, including Katz and Lillienfeld, visited the Blockbuster where Coleman had rented movies the night of Robles's murder. There, they discovered video evidence that corroborated Coleman's innocence, and they hid or destroyed portions of that video evidence.

23. Coleman was subjected to a polygraph examination and interrogation conducted by Defendant Powell, who worked with Defendant Officers, including Katz and Lillienfeld, to conduct the interrogation. Defendant Officers, including

Powell, Katz, and Lillienfeld, fabricated evidence from the polygraph examination and hid or destroyed documentation from the polygraph examination.

**DEFENDANTS ADD SOTO AS A SUSPECT WHILE HIDING OR DESTROYING EVIDENCE OF ALTERNATE SUSPECTS**

24. Subsequently, Defendant Officers, including Katz, Lillienfeld, Mike Valento (a gang detective stationed at LASD's Lennox Station), and Cynthia Valencia (an LASD deputy also stationed at Lennox) continued to investigate Robles's murder.

25. Defendant Officers, including Katz, Lillienfeld, Valento, and Valencia, obtained leads regarding (1) a vehicle that matched the description of the distinctive white van involved in the shooting and (2) suspected gang members who were tied to that white van.

26. The suspected gang members associated with the white van were alternate suspects to Coleman and Soto. The Defendant Officers obtained evidence implicating those suspects and tying them to the van.

27. In January 2004, Defendant Valento obtained additional information regarding a car that matched the distinctive white van and suspected gang members.

28. In March 2004, Defendants Valento and Valencia again interviewed Albert Segundo.

29. Defendants learned the alternative suspects—members of the same suspected gang tied to the white van—had visited Segundo in the meantime.

30. Even then, Segundo still did not identify Coleman as the driver; instead, he said that the victim's dad "told me it was Jofama," that there wasn't enough light to identify the driver, and that the victim's s brother said Coleman was the driver and he "couldn't go against that" and "had to go with" what brother said.

31. Segundo also now claimed to Valento and Valencia that he believed Abel Soto was the shooter in Jose Robles's murder.

32. Defendant Officers, including Valento, Valencia, Lillienfeld, and Katz, discussed what to do next based on the interview with Segundo. Even though Segundo had provided evidence implicating other suspects, the Defendant Officers decided not to pursue those leads any further. They additionally agreed to destroy and/or hide evidence relating to alternate suspects and to instead pursue two suspects: Coleman and Soto.

33. Defendant Daniel Rosenberg, who supervised Defendants Lillienfeld and Katz, agreed to pursue this course of action. In so doing, Defendant Rosenberg agreed to hide evidence that would have helped Coleman and Soto.

34. Defendant Valento wrote a false report of his interview with Segundo to bolster the case against Coleman and Soto and to hide evidence of potential

gang pressure and involvement in the shooting.

35. The Defendant Officers altered, hid, or destroyed portions of the recording of Valento's interview with Segundo to bolster the bogus case against Coleman and Soto.

36. On March 7, 2004, Valento met with Segundo again to conduct identification procedures. Segundo could not identify Soto in a photo array. Segundo identified Coleman in a photo array but, according to Valento's report, did not identify Coleman as the driver of the white van involved in the shooting. Valento falsified and/or hid evidence relevant to this meeting. In March 2004, Defendant Officers including Valento, Lillienfeld, and Katz, discussed the problem for their investigation that although Segundo claimed Soto was the shooter, Segundo had failed to identify Soto. Some of these concerns were expressed in writing—and those documents were obviously exculpatory—but they were suppressed from Coleman and Soto.

**DEFENDANTS HIDE FURTHER EVIDENCE**

37. In March 2004 and subsequently, the Defendant Officers, including Valento, Lillienfeld, Katz, and Valencia, continued to pursue convictions of Coleman and Soto while suppressing evidence of other suspects.

38. For example, Valento and Valencia spoke with the victim's family on March 18, 2004. Rudy Robles, the victim's father, provided information about the

distinctive white van involved in the murder, which he believed he had seen, but the Defendant Officers hid that information.

39. Valento and Valencia conducted an irregular interview and photo identification procedure with Jesse Robles, the victim's brother. Specifically, they interviewed and conducted a photo identification procedure with Jesse Robles in the presence of members of his family who were also witnesses to the shooting. Valento and Valencia knew that this identification procedure was improper and increased the risk of a misidentification.

40. As a result, Jesse Robles misidentified Coleman as the driver in Jose Robles's murder. Jesse Robles was shown a photograph of Soto but did not identify him.

**DEFENDANTS COERCE COLEMAN'S ALIBI WITNESSES**

41. The Defendant Officers, including Valento, Lillienfeld, and Katz, decided to coerce incriminating statements from Coleman's alibi witnesses by falsely arresting them. They wrote false warrants for the arrests of several witnesses and arrested them on April 8, 2004.

42. The Defendants lacked probable cause to arrest those witnesses but arrested them anyways.

43. The Defendants threatened the witnesses that they would be charged with Jose Robles's murder unless they implicated Coleman and/or Soto.

44. The detectives hid or destroyed statements from the witnesses that were exculpatory for Coleman and Soto.

**DEFENDANTS COERCIVELY INTERROGATE ABEL SOTO**

45. In April 2004, Defendant Officers, including Valento, Lillienfeld, and Katz, conducted coercive interrogations of Abel Soto, who was sixteen years old at the time.

46. The officers told multiple lies to Soto, including that a perpetrator of the crime had identified him as the shooter and that his DNA had been found on shell casings associated with Jose Robles's murder.

47. The officers threatened Soto and pressured him to incriminate himself or others to reduce his liability.

48. The officers continued interrogating Soto even after he indicated he did not want to speak with them.

49. Despite these tactics, Soto continued to assert his innocence.

**DEFENDANTS COMMIT FURTHER MISCONDUCT**

50. Two years after he failed to identify Soto or Coleman as perpetrators of Jose Robles's murder, detectives, including Katz and Valento, again spoke with Albert Segundo.

51. Detectives illegitimately obtained misidentifications of Soto and Coleman during their interview. In so doing, Detectives showed Segundo a

suggestive photo identification of Soto in which Soto was the only one of six pictured individuals who matched Segundo's previous description.

52. Detectives failed to record, or destroyed or hid a recording of, a key interview with Segundo that would have impeached his supposed identification.

53. Defendant Officers, including Katz, Valento, Lillienfeld, and Valencia, obtained information related to the distinctive white van involved in the shooting, which was not disclosed to Coleman and Soto.

54. In fact, the victim's father had given the Defendant Officers information that linked two other suspects to the white van and thus to Jose Robles's murder. Defendant Officers, including Katz, Valento, Lillienfeld, and Valencia, hid this information from Coleman and Soto.

55. Defendant Officers, including Katz, Lillienfeld, Valento, and Valencia, conducted photo identification procedures with witnesses that had exculpatory value for Coleman and Soto. These Defendants hid or destroyed evidence of these identification procedures, depriving Coleman and Soto of evidence that could have helped them defend themselves.

56. Defendant Officers, including Katz, Smith, and Lillienfeld, also wrote false reports that misrepresented the statements of witnesses they interviewed to create false evidence against Coleman and Soto.

57. Defendant Officers, including Katz, Smith, and Lillienfeld, also hid,

destroyed, edited, and/or altered audio recordings to falsely bolster the case against Coleman and Soto and to hide evidence of alternative suspects and/or impeaching statements by witnesses.

58. Defendant Officers, including Smith, Katz, Lillienfeld, and Valento, destroyed evidence of notes they had taken during the investigation, including handwritten notes and dictations, that were exculpatory for Coleman and Soto.

59. Defendant Officers, including Smith, Katz, Lillienfeld, and Valento, hid or destroyed evidence of statements from Jesse Robles that impeached his supposed identification of Jofama Coleman.

60. On information and belief, the Defendant Officers suppressed and fabricated other evidence still not known to Coleman and Soto.

61. Defendant Officers identified and interviewed alternate suspects with connections to the murder but suppressed or destroyed this evidence.

**COLEMAN AND SOTO ARE WRONGLY PROSECUTED AND CONVICTED**

62. No murder weapon, getaway car, DNA evidence, fingerprints, or other physical or forensic evidence was ever found connecting Coleman or Soto to Jose Robles's murder.

63. Nonetheless, because of the Defendant Officers' misconduct, Coleman and Soto were charged with murder and other crimes related to Jose

Robles's murder.

64. There was no probable cause to believe that Coleman or Soto were involved in Robles's murder in any way, either before or after the Defendant Officers' misconduct.

65. Nonetheless, the Defendant Officers' misconduct caused Coleman to be prosecuted.

66. Following a jury trial, Coleman was convicted of murder and sentenced to 25 years to life in prison.

67. The Defendant Officers' misconduct also caused Soto to be prosecuted. Soto's first jury trial ended in a mistrial. At his second trial, he was convicted of murder and other related crimes and was sentenced to 72 years and eight months to life in prison.

68. Without the Defendant Officers' misconduct, Coleman and Soto would not have been prosecuted or convicted.

**COLEMAN AND SOTO'S WRONGFUL CONVICTIONS ARE OVERTURNED**

69. Evidence identifying alternative perpetrators was presented to the courts that confirmed Coleman and Soto's innocence of Robles's murder.

70. As a result, in 2024, Coleman and Soto's convictions were vacated by the Superior Court of California, Los Angeles County, the charges were entirely

dismissed, and they were declared factually innocent.

## THE POLICIES AND PRACTICES OF THE SHERIFF'S DEPARTMENT CAUSED COLEMAN AND SOTO'S WRONGFUL CONVICTIONS

71. During the times relevant to when Coleman and Soto were wrongfully arrested, prosecuted, and convicted, the LASD condoned and cultivated a culture of impunity which caused Coleman and Soto's wrongful convictions.

72. For example, the LASD condoned and tolerated gangs of Sheriff's deputies that organized outside of the agency's hierarchy to reward members and exercise power over non-members. This tolerance communicated to the Defendant Officers that the LASD had intentionally abandoned its responsibility of supervising deputies.

73. Sheriff's deputies were exposed to deputy gangs from the starts of their careers. Every new Sheriff's deputy's first assignment is serving as a guard in one of the County's jails.

74. Sheriff's deputies at the jails are organized into gangs, including the "2000 Boys," the "3000 Boys," and the Posse. Deputies join the gangs by committing brutal violence against prisoners at the jail.

75. These deputy gangs, like other deputy gangs throughout the LASD ("Department"), exercise independent control over the areas in which they work, above and apart from their nominal supervisors. Thus, deputies in their first jail

assignments quickly learn that the Department has abdicated its own responsibility for supervising and disciplining deputies and has delegated such responsibility to deputy gangs.

76. Deputy gangs initiated new members by requiring them to commit acts of brutality or excessive force. The gangs took the attitude that excessive force against residents was necessary to control crime. Their members believed that constitutional rights were less important than being tough with perceived criminals. The LASD endorsed and tolerated these gangs and allowed them to operate. That tolerance signaled to officers, including Defendant Officers, that getting convictions and being aggressive and tough was more important than respecting residents' constitutional rights.

77. Deputy gangs were also rampant at stations across Los Angeles County. New trainees at the Lynwood Station were given Viking pins on the first day of patrol training. At the end of their training periods, the Vikings deputy gang initiated select deputies through an initiation process that involved tattooing them with the gang's symbol.

78. Deputy members of the Vikings gang engaged in egregious misconduct, including retaliating against supervisors whom they perceived as enemies.

79. The Sheriff and his delegees knew that it was important to exercise

control over deputies to ensure that they respected residents' constitutional rights and obeyed the law. They received internal and external notice of the prevalence of deputy gangs and knew that deputy gang members shared a philosophy of violating residents' rights to try to secure convictions. However, the LASD made an intentional choice to allow those gangs to operate by not acknowledging their existence, allowing membership in such gangs, and choosing not to monitor or track deputy gang membership.

80. Sheriff Sherman Block, who was Sheriff from 1982 to 1998, condoned the LASD's deputy gangs. He once told a reporter, "Flashing a sign? That's meaningless. In fact, I'm sure the gang members out there get a kick out of deputies flashing a sign, having their own gang." Employees of the Department, including the Defendant Officers, understood that Block condoned deputy gangs.

81. In January 1991, Paul Tanaka was promoted to lieutenant, despite being an active member of the Vikings gang. Tanaka would later assume an executive position in the Department and contributed to the Department's failure to monitor, discipline, and prevent deputy gangs. The Defendant Officers understood that deputy gang members received promotions and that the LASD's policy was that deputy gang membership was not a disqualification for promotion within the LASD.

82. Long before he became Sheriff in 1998, Lee Baca knew that many

deputy gangs operated across the Department.

83. After Baca became Sheriff, he decided to allow deputy gangs to continue to operate within the LASD. Baca knew, through his own experiences and through media reports and coverage, that Sheriff's deputies had organized gangs and had taken control over certain stations within LASD.

84. The Defendant Officers knew that Baca had not taken action against deputy gangs and understood that the Department would not discipline them for the same illegal activities engaged in by those gangs, including fabricating evidence, suppressing evidence, and making unconstitutional threats.

85. Deputy gangs were active at stations involved in Coleman and Soto's wrongful conviction, particularly the Lennox station. The Defendant Officers knew that the Department condoned deputy gangs at those stations. The LASD's policy was that closing cases and "getting tough" with residents was more important than exercising control over deputies or preventing constitutional violations, as communicated by its decision to allow these deputy gangs to operate.

86. Baca delegated considerable authority to Tanaka despite Tanaka's deputy gang affiliation and his decision to ignore deputy misconduct.

87. Following the revelation of widespread gang activity, racist actions, and other misconduct, Special Counsel James G. Kolts wrote and published a report in 1992 on misconduct issues across the Department. The report revealed—

and put the Department on notice—that deputy gangs were widespread and responsible for violations of residents' rights.

88. The LASD allowed commanders and other supervisors to ignore the deputy gangs operating under their supervision instead of requiring its commanders to know the specific problems in place at the stations under their supervision, whether deputy gangs were active at each station and the influence exerted by those gangs, and what kinds of misconduct were committed by gangs at those stations.

89. By 2003, the Department's policy of allowing deputies to self-organize in deputy gangs had taken full effect and was known to the Defendant Officers. Deputy gang members had risen to leadership positions within the Department and condoned the gangs.

90. The Regulators were another active deputy gang. The Regulators shook down deputies to raise money for deputies who received suspensions via the LASD's disciplinary processes. The effect was to counteract whatever disciplinary impact might have come from suspensions for misconduct.

91. The Regulators were committed to an intensive code of silence no different from that observed among criminal gangs; under oath, one Regulator refused to discuss how the gang made decisions because such information was not publicly known.

92. Indeed, Regulator deputies refused to talk with the Department's investigators regarding the gang's activities. The gang took over a Sheriff's station and refused to respect the orders of superior officers. The Department tolerated and condoned the activities of the Regulators and other gangs.

93. The Reapers were a deputy gang active at Lennox Station. Reaper gang members—deputies of the Los Angeles Sheriff's Department—were admitted to the group by invitation only. They were initiated via a tattoo given to them using a secret stencil maintained by the gang. The tattoos were numbered and the names of Reaper members were maintained in a ledger kept by a veteran officer. The Reapers committed numerous illegal and criminal acts and violations of residents' rights.

94. Leadership within the Los Angeles Sheriff's Department knew that the Reapers were active at Lennox Station and knew that the management and leadership of the station had been, in effect, usurped by the Reapers deputy gang, but did not intervene or otherwise prevent the behavior.

95. Despite lacking any evidence that the Department's deputy gang problem had been resolved, Los Angeles County and the LASD failed to monitor or investigate the persistence of deputy gangs within the Department.

96. The LASD and the County of Los Angeles had a policy and practice of fabricating and suppressing evidence from criminal suspects, and of tolerating

and allowing such actions by its deputies. The Defendant Officers fabricated and suppressed evidence in the Robles murder investigation pursuant to that policy and practice.

97. Examples of these practices include:

a) In October 1989, Sheriff's deputies Elizabeth Smith and Anthony Campbell beat Demetrio Carrillo after he spoke briefly with a woman who was being cited by a deputy sheriff. The deputies then arrested Carrillo without justification and prepared false reports against him to justify his arrest.

b) In February 1990, multiple Sheriff's deputies were charged with federal crimes in connection with the theft of more than a million dollars during drug raids. Numerous deputies were eventually convicted on corruption charges. Testimony at those deputies' trials revealed that deputies at the Lennox Station beat suspects, stole money, and framed suspects by pilfering cocaine from the Department's evidence storage and planting it in homes and vehicles.

c) Deputies involved in the 1990 corruption scandal also lied in search warrant affidavits and filed false police reports. Nearly two dozen criminal cases were dismissed, plea-bargained, or reviewed because of the scandal.

d) In February 1990, deputies dragged Jose Ortega from his friend's porch and struck him in the back with a metal flashlight without necessity or justification. They left him without arresting him, but later returned to take him to the hospital. At the hospital, the deputies arrested him and filed false and misleading police reports which included false statements and material omissions.

e) In March 1990, deputies submitted knowingly false affidavits to obtain search warrants on several residences in the City of Lynwood. They entered these residents' homes, terrorized and humiliated them at gunpoint, and ransacked their houses. Using the threat of violence, they detained and interrogated the residents in an effort to coerce confessions from them.

f) In April 1990, deputies fabricated inculpatory evidence and suppressed exculpatory evidence regarding Thomas Rosas. To cover up their gratuitous violence, they falsely alleged that Rosas drank an alcoholic beverage on a public street, was verbally abusive towards officers, struck or tried to strike officers, or attempted to resist arrest. They also omitted from their reports that deputies tasered Rosas twice for no reason and used unreasonable and unnecessary force against Rosas.

g) In May 1990, deputies falsely stated verbally, then falsely wrote, that resident Tracy Batts was armed with a handgun. They created this false narrative to justify their gratuitous shooting and killing of an unarmed man.

h) In May 1990, deputy Paul Archambault falsely claimed that Elzie Coleman had brandished a handgun. After shooting and killing Coleman, Archambault fabricated evidence and wrote a false police report to justify the killing. Deputies removed witnesses from the scene of the shooting, falsely arrested eyewitnesses to cover up the true facts of the shooting, and presented false evidence and testimony at trial.

i) In 1991, the Department's deputies suppressed evidence regarding their killings of residents: for example, describing an object held by a man they shot and killed as a "rifle-like" object when it in fact was a wooden club and describing another man they killed as pointing a revolver at them when he in fact dropped his weapon before a deputy shot and killed him.

j) Around 1995, deputies fabricated and suppressed evidence related to an unlawful police shooting. The deputies claimed that the suspect pivoted and pointed a gun at them. However, the suspect was shot in

the back, demonstrating that he had not turned to fire at the deputies. And the suspect's supposed gun was found 37 feet away from where the suspect fell, but deputies shot the suspect in his spinal cord and inflicted an injury that would have prevented him from running 37 feet after being shot. The deputies' account of the shooting was obviously false. Still, the deputies suppressed the true facts of the shooting. The Department's internal investigation was so inadequate and flawed that it did not even mention that the suspect was shot from behind.

k) In 1996, a field training officer pled no contest to criminal charges after being accused by his trainee of planting false evidence and destroying evidence with the purpose of harassing Black and Latino residents. The trainee whistleblower faced violence and threats from deputy gang members and left the Department for her safety and the safety of her family. However, the Department never monitored and rooted out the deputy gang members responsible for this retaliation.

l) In March 1999, David Auner suppressed evidence showing that witnesses to a shooting had been improperly admonished. Auner failed to give the appropriate admonishment to three eyewitnesses, then falsified a report claiming that he had appropriately admonished

them.

m) Between 1991 and 2011, the Department suppressed evidence of Francisco Carrillo's wrongful conviction. Deputy Craig Ditsch used an unduly suggestive identification procedure, telling a key eyewitness that Mr. Carrillo committed the crime and then suppressing evidence of his improper procedure. Ditsch further suppressed that information and falsely represented in his report that the witness had independently identified Mr. Carrillo. Ditsch conspired with other deputies to use a photo "six pack" created in another case (which also involved false eyewitness evidence) to influence the eyewitness to falsely identify Mr. Carrillo. Even after Mr. Carrillo was wrongfully convicted of murder, Ditsch and other Sheriff's deputies conspired to hide evidence of their wrongdoing.

n) Between 1985 and 2012, the Department suppressed evidence of Frank O'Connell's wrongful conviction. Sheriff's detectives failed to disclose evidence pointing to another suspect and improperly influenced witnesses. Specifically, detectives used unduly suggestive identification procedures to pressure a key witness to identify O'Connell; detectives intimidated that same witness into making a false identification; and detectives failed to turn over notes indicating

that another person who matched a description of the suspect had tried to kill the victim years prior. The detectives continued in a conspiracy to hide evidence of this wrongful conviction during this time.

o) Between 2001 and 2023, the Department suppressed evidence of Alexander Torres's wrongful conviction. Sheriff's detectives failed to disclose evidence pointing to other suspects and improperly influenced witnesses. Specifically, detectives fabricated statements from witnesses to obtain identifications of Torres, hid identification procedures that impeached those eyewitnesses, and failed to turn over notes identifying alternate suspects. The investigation was conducted in part by an LASD detective who was a member of the Vikings. The detectives continued in a conspiracy to hide evidence of Mr. Torres's wrongful conviction during this time.

98. During his tenure, Sheriff Baca systematically covered up misconduct within the Department and shielded its employees from public accountability.

99. In response to an FBI investigation of abuses committed by Sheriff's deputies, Baca hid a prisoner-informant within the County's jail system from FBI investigators. Baca also allowed two Sheriff's sergeants to threaten the lead FBI agent investigating deputy abuse.

100. LASD deputies, including the Defendant Officers, knew that the

Department did not oppose the suppression of exculpatory evidence or the fabrication of evidence. The Defendant Officers in this case acted in accordance with those policies and practices to convict Coleman and Soto of a murder that they did not commit.

101. The LASD and the County of Los Angeles had a policy and practice of training officers to commit misconduct and to seek convictions even if it meant violating f residents' rights.

102. The Department knew that field training officers assigned to train and mentor new patrol deputies often committed misconduct and encouraged deputies to commit misconduct. It allowed deputies to be trained in improper and unconstitutional policing, consistent with its policy that being tough with residents and securing convictions was more important than respecting their constitutional rights.

103. The Department also allowed deputy gangs to influence and control the assignment of field training officers.

104. In April 1994, an independent monitor recommended that the LASD provide for centralized selection of field training officers and set specific criteria for removal of current field training officers, and automatic disqualification of field training officer applicants, for dishonesty or excessive force. The LASD instead chose to allow deputies who had committed excessive force or who had been found

dishonest to serve as field training officers and continued to emphasize convictions and aggressiveness over constitutional rights.

105. The Defendant Officers recognized that the LASD would not discipline them for misconduct or would administer only minimal discipline even for serious misconduct. Further, LASD's policy was to cover up misconduct and to shield both its employees and itself as a municipal entity from scrutiny and oversight.

106. For example, the Department routinely covered up misconduct committed by its deputies by failing to accurately categorize it. It frequently designated excessive force by its deputies as "discourtesy" or "improper tactics," even for allegations of extreme force like being struck twice in the stomach or being struck repeatedly with flashlights and batons.

107. Sheriff's supervisors also protected deputies from discipline and monitoring by "counseling" residents who came to the station to make complaints and trying to convince residents not to file complaints. Supervisors routinely failed to document such complaints. The LASD encouraged such actions because it did not want to be subject to scrutiny and oversight.

108. Although the Department employed investigators to investigate deputy misconduct, those investigators routinely participated in cover-ups of misconduct. For example, when deputies responded to investigations with legal

justifications instead of factual accounts, investigators made no effort to determine what actually happened.

109. Department employees routinely submitted incomplete use of force packages to cover up deputy misconduct. For example, they routinely failed to videotape or photograph injuries alleged in use of force incidents, failed to interview the complainant and witnesses to police uses of force, and omitted important suspect and witness statements (such as allegations of racial slurs and verbal abuse by deputies).

110. Even when deputies committed serious misconduct that endangered the life and constitutional rights of suspects, the Department responded with minimal and ineffective punishment. For example, around 1995, the Department gave a suspension of just four days to a deputy who pepper-sprayed an unconscious, intoxicated man four times, causing such severe chemical injuries that he had to go to the hospital. It gave a two-day suspension to a deputy who beat and abused a disabled fourteen-year-old boy without any justification. And it suspended for just two days a deputy who tried to tase a woman who had doused herself in gasoline; aware that he could have caused her to burst into flames, the deputy explained that he had tried to aim for a “dry spot.”

111. In 1993, a sheriff’s deputy severely beat a Black man who had tried to sell him a car radio, referring to him as a “n-----” and saying that he “hated n------.”

Despite the excessive force and outrageous racism of the deputy's actions, the Department gave him only a light punishment, communicating to deputies—including the Defendant Officers—that it would not punish officers who used excessive force with residents while ignoring their rights.

112. In 1995, an LASD sergeant assembled a seven-man team armed with flashlights, mace, and a taser to extract a prisoner from his cell for the sole purpose of administering a blood pressure test, ostensibly for the prisoner's health and benefit. The deputies beat the prisoner badly enough to break his jaw, requiring surgery. The sergeant's captain refused to discipline him and exonerated the sergeant, agreeing that the force used was "completely controlled, and minimal." The LASD endorsed this failure to discipline and allowed it to occur.

113. The Department also chose not to meaningfully discipline deputies for obvious lies. For example, around 1997, a deputy beat a tackled suspect with a flashlight on the back several times and kicked him twice during a daytime arrest. He was asked why he chose to carry his flashlight in broad daylight, and responded, "You never know if you will have to go under a house or somewhere where it is dark, or if it is still light." The Department rejected his explanation, meaning that it determined that he lied in the course of a misconduct investigation. But despite the combination of excessive force and intentional dishonesty, the Department suspended the deputy for only two days.

114. The Department similarly imposed only light discipline on supervisors even for egregious misconduct, suggesting to supervisors and patrol deputies alike that misconduct would not be seriously punished. Around 1997, a lieutenant grabbed a witness by the collar, lifted him off the ground, spoke angrily to him, and threw the resident down, having lost control of himself. The lieutenant did not document his use of force and lied about his actions, denying using any force at all. He was defiant against his investigators and questioned why he was being investigated at all. He even instructed a subordinate not to mention his use of force in an official report. Despite his misconduct and dishonesty, the Department gave only a written reprimand to the lieutenant.

115. Around 1997, personnel in the Department's Region II were allowed to flout the rules requiring that every citizen's complaint be formally reported and documented. The Department's disciplinary processes were so lax that this deviation continued and Department personnel understood that the Department endorsed such deviations.

116. The Department ignored evidence of misconduct by its officers. Evidence of officer wrongdoing and dishonesty frequently surfaced during civil litigation against the Department. The Department failed to review and respond to such evidence.

117. By June 2000, the Department discontinued its use of centralized risk

management meetings and decreased its supervision of command-level staff and station-level misconduct. Consistent with its decision to endorse and allow deputy gangs and widespread police misconduct, the Department decreased its supervision of misconduct, communicating to deputies including the Defendant Officers that they need not fear discipline for misconduct.

118. Even by October 2001, the Department had not reversed its position of lax oversight. It continued to eschew risk management, accountability, control of the use of force, and the use of early warning and trend data. The Department consciously chose to ignore the many constitutional violations committed by its personnel.

119. Coleman and Soto's wrongful convictions were caused because the Defendant Officers understood that they had free reign to violate their rights, pursuant to LASD's policy of shielding its deputies from meaningful supervision and discipline.

120. The Department also chose to allow its officers to conduct unreliable and unduly suggestive eyewitness identification procedures because it valued securing convictions more than respecting residents' rights. As a result, residents were frequently prosecuted as a result of fundamentally flawed and corrupt eyewitness identification procedures. The Defendant Officers conducted unduly suggestive identification procedures in accordance with these policies and

practices.

121. The Department chose to allow deputies to improperly influence eyewitnesses, including feeding information to those witnesses to skew their identifications so that the witnesses would identify the deputies' preferred suspects.

122. The Department chose not to train its deputies to provide exculpatory eyewitness identification information to the prosecutor(s) in the case in which the eyewitness was making an identification.

123. The Department chose not to supervise deputies to require them to provide exculpatory eyewitness identification information to the prosecutor(s) in the case in which the eyewitness was making an identification.

124. The Department allowed homicide detectives to operate with effectively no supervision, contributing to improper eyewitness procedures, suppression of evidence, and fabrication of evidence such as occurred in this case.

125. The Defendant Officers' unduly suggestive identification procedures in the Robles murder investigation were conducted pursuant to the LASD's practices and policies. The Defendant Officers knew that they need not fear discipline for improperly pressuring witnesses to make identifications or for fabricating such identifications.

126. The Los Angeles Sheriff's Department maintained a practice of hiding exculpatory evidence in "Poor Boy" investigative files that were hidden from

prosecutors and criminal defendants, allowing homicide detectives to withhold identification procedures, evidence of alternate suspects, and other exculpatory evidence from criminal defendants.

**COLEMAN'SDAMAGES**

127. Coleman spent nearly twenty years incarcerated for crimes that he did not commit.

128. Coleman experienced tremendous pain and suffering. He was separated from his then-wife and their infant daughter and remained separated from them for the duration of his incarceration. He was unable to share holidays, births, and other life events with loved ones. He lost the opportunity to start a career and now faces the tremendous challenge of adjusting back to life in the free world. He suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above, all caused by the Defendant Officers' misconduct and the policies and practices of Defendants LASD and County of Los Angeles.

**JOCELYNE COLEMAN'S DAMAGES**

129. Jocelyne Coleman was born in 2004, the year Defendant Officers falsely arrested Jofama Coleman and caused him to be wrongfully prosecuted.

130. Because of the Defendant Officers' misconduct, Ms. Coleman was

robbed of her father. Instead of sharing birthdays, holidays, graduations, and daily life with her father, her contact was limited to jail and prison visits and phone calls.

**COUNT I – 42 U.S.C. § 1983**

**Fourteenth Amendment: Due Process, Fair Trial**

131. Each paragraph of this Complaint is incorporated as if restated fully herein.

132. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory and impeachment evidence from Coleman, his attorneys, and prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Coleman.

133. In the manner described more fully above, the Defendant Officers fabricated false statements, including inculpatory statements of witnesses, fabricated reports and other evidence falsely implicating Coleman in Jose Robles's murder, that ultimately resulted in Coleman's wrongful conviction pursuant to the use of false evidence.

134. In addition, these Defendant Officers produced a series of false and fraudulent reports and related documents, which they inserted into their file and that were later presented to state prosecutors and judges. These documents, which were used to show Coleman's purported connection to the murders, contained statements and described events that were fabricated and Defendant Officers knew

to be false. Defendant Officers signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false. Defendant Officers suppressed and withheld evidence of their wrongdoing.

135. In the manner more fully described above, the Defendant Officers also procured eyewitness misidentifications of Coleman by using unduly suggestive techniques. The resulting misidentifications and circumstances surrounding them were used against Coleman and tainted his criminal trial. The identification procedures were unnecessarily suggestive and resulted in unreliable misidentifications.

136. The Defendant Officers also suppressed evidence that demonstrated their knowledge of, or deliberate indifference to, Coleman's innocence, including evidence indicating that other suspects committed the shooting and evidence that eyewitnesses were unable to identify Coleman as the driver.

137. In addition, based upon information and belief, Defendant Officers concealed, destroyed, and fabricated additional evidence that is not yet known to Coleman.

138. The misconduct of all the Defendant Officers directly resulted in the unjust and wrongful criminal prosecution and conviction of Coleman and the deprivation of Coleman's liberty, thereby denying him his constitutional right to

due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Coleman would not and could not have been pursued, and there is a reasonable probability that he would not have been convicted.

139. The misconduct of all of the Defendant Officers also directly resulted in the Coleman's unjust criminal conviction, thereby denying him his constitutional right to due process, a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

140. As a result of Defendant Officers' misconduct described in this Count, Coleman suffered loss of liberty and sustained and continue to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

141. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Coleman's constitutional rights.

142. The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Los Angeles Sheriff's Department and the County of Los Angeles, which Coleman was the

victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

**COUNT II – 42 U.S.C. § 1983**

**Fourth Amendment: Seizure Without Probable Cause**

143. Each paragraph of this Complaint is incorporated as if restated fully herein.

144. In the manner described more fully above, the Defendant Officers, acting as investigators, individually, jointly, and in conspiracy with each other, accused Coleman of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Coleman without any probable cause for doing so and in spite of the fact that they knew Coleman was innocent.

145. The Defendant Officers accused Coleman of criminal activity knowing those accusations to be without genuine probable cause, and exerted influence over the institution and commencement of the judicial proceedings.

146. The Defendant Officers caused Coleman to be seized without probable cause and deprived him of his liberty, in violation of his rights secured by the Fourth Amendment.

147. The Defendant Officers caused Coleman to be improperly subjected to judicial proceedings for which there was no probable cause.

148. These judicial proceedings were instituted and continued by

Defendant Officers maliciously, resulting in injury.

149. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

150. The prosecutions terminated in Coleman's favor. His conviction was vacated and he was adjudicated innocent.

151. As a result of Defendant Officers' misconduct described in this Count, Coleman suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

152. The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Los Angeles Sheriff's Department and the County of Los Angeles, which Coleman was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

**COUNT III – 42 U.S.C. § 1983**

**Failure to Intervene**

153. Each paragraph of this Complaint is incorporated as if restated fully herein.

154. In the manner described above, by their conduct and under color of

law, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Coleman's constitutional rights, even though they had the opportunity to do so.

155. These Defendant Officers had a reasonable opportunity to prevent this harm, but failed to do so.

156. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Coleman's clearly established constitutional rights.

157. As a result of the Defendant Officers' failure to intervene to prevent the violation of Coleman's constitutional rights, Coleman suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

158. The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Los Angeles Sheriff's Department and the County of Los Angeles, which Coleman was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

**COUNT IV – 42 U.S.C. § 1983**

**Conspiracy to Deprive Constitutional Rights**

159. Each paragraph of this Complaint is incorporated as if restated fully herein.

160. After the murder of Jose Robles, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Coleman of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

161. Additionally, before and after Coleman's conviction, the Defendant Officers further conspired to deprive Coleman of exculpatory information to which they were lawfully entitled.

162. In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

163. In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above and was an otherwise willful participant in joint activity.

164. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Coleman's rights.

165. As a result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Coleman's rights were violated, and he suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

166. The misconduct by all the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Los Angeles Sheriff's Department and the County of Los Angeles, which Coleman was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

**COUNT V – 42 U.S.C. § 1983**

***Monell* Claim**

167. Each paragraph of this Complaint is incorporated as if restated fully herein.

168. Coleman's injuries described in this complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of the Defendants County of Los Angeles and the LASD, as well as by the actions of their policy-making officials.

169. At all times relevant to the events described in this complaint and for

a period of time before and after, the County of Los Angeles and the LASD failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: the conduct of interrogations and questioning of criminal suspects and witnesses; the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses and suspects; and the maintenance of investigative files and disclosure of those files in criminal proceedings.

170. In addition or alternatively, the County of Los Angeles and the LASD failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers of the LASD, with respect to the conduct of interrogations and techniques to be used when questioning criminal suspects and witnesses; the production and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of the files in criminal

proceedings.

171. Officers and agents of the County of Los Angeles and the LASD committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

172. Defendants County of Los Angeles and the LASD were aware of the need for adequate policies, training, and supervision, were deliberately indifferent to the need, and made a deliberate choice not to adopt adequate policies, training, or supervision, all of which was an official policy.

173. Had policymakers of the County of Los Angeles and the LASD promulgated appropriate policies, the violation of Coleman's constitutional rights would have been prevented.

174. In addition, at all times relevant to the events described in this complaint and for a period of time before, the Defendants County of Los Angeles and the LASD had notice of practices and customs of officers and agents of the LASD that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative or other materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses, including by feeding facts, issuing undisclosed threats, and manipulating witnesses; (3) officers failed to maintain and/or preserve material evidence and/or

destroyed evidence, including physical evidence; and/or (4) officers pursued wrongful convictions through profoundly flawed investigations.

175. These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the County of Los Angeles and the LASD directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees; by failing to adequately punish and discipline prior instances of similar misconduct; and by maintaining a code of silence pursuant to which officers were encouraged not to rat one another out, thus directly encouraging future abuses like those affecting Coleman.

176. The above practices and customs were so well settled as to constitute de facto policies of the County of Los Angeles and the LASD. The practices and customs were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it, even though it was foreseeable that such practices and customs would result in wrongful convictions such as Coleman's.

177. Within the County of Los Angeles and the LASD, a culture of impunity, a code of silence, and a failure to discipline and supervise allowed widespread misconduct to go unchecked, as described more fully above.

178. The fact that the misconduct described in this complaint during the Robles homicide investigation was carried out openly and conspiratorially amongst numerous officers, including experienced homicide detectives, reflects the widespread, pervasive nature of the misconduct in the LASD at times relevant to the events described in this complaint.

179. In addition, the misconduct described in this count was undertaken pursuant to the Defendants County of Los Angeles and the LASD's policies and practices in that the constitutional violations committed against Coleman were committed with the knowledge, approval, or endorsement of persons with final policymaking authority for the County of Los Angeles and the LASD or were actually committed by persons with such final policymaking authority.

180. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and caused Coleman to suffer the grievous and permanent injuries and damages set forth above.

181. Coleman's injuries were caused by officers, agents, and employees of the County of Los Angeles and the LASD, including but not limited to the Defendant Officers, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

182. As a result of the Defendants County of Los Angeles and LASD's

policies, practices, and customs, Coleman suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

**COUNT VI – VIOLATION OF JOCELYNE COLEMAN'S RIGHT TO FAMILIAL ASSOCIATION UNDER THE FOURTEENTH AMENDMENT**

183. Each paragraph of this Complaint is incorporated as if restated fully herein.

184. As alleged above, the Defendants, while acting individually, jointly, and/or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Jofama Coleman of his constitutional right to due process and his right to a fair trial by fabricating evidence and suppressing exculpatory evidence.

185. At the time of their misconduct, the Defendants knew or should have known that Jocelyne Coleman had a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship, society, and comfort between herself and her father, Jofama Coleman.

186. As a result of the Defendants' misconduct, Jofama Coleman suffered loss of liberty for nearly twenty years, depriving Jocelyne Coleman of the care, comfort, consortium, love, and emotional and financial support from her father

during and after the period of time while he was imprisoned.

187. As a result of the Defendants' misconduct, Jocelyne Coleman suffered great mental anguish, emotional pain and suffering, and other grievous and continuing injuries and damages.

WHEREFORE, Plaintiffs, JOFAMA COLEMAN and JOCELYNE COLEMAN, respectfully requests that this Court enter judgment in their favor and against Defendants, awarding compensatory damages, attorneys' fees, and costs against each Defendant, prejudgment and post-judgment interest, and punitive damages against each of the Defendant Officers, as well as any other relief this Court deems appropriate including but not limited to injunctive or other non-monetary equitable relief.

**JURY DEMAND**

Plaintiffs, JOFAMA COLEMAN and JOCELYNE COLEMAN, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**JOFAMA COLEMAN AND JOCELYNE COLEMAN**

By: /s/ David B. Owens__________
*One of Plaintiffs' attorneys*

David Owens (SBN 275030)
Megan Pierce (SBN 314044)

Jon Loevy, IL Bar: 6218254*
Steven Art, IL Bar: 6302319*
Wallace Hilke, IL Bar: 6329814*
david@loevy.com
megan@loevy.com
jon@loevy.com
steve@loevy.com
hilke@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902

**Pro hac vice admission pending*

Michael D. Seplow (SBN 150183)
Paul Hoffman (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
Schonbrun Seplow Harris
Hoffman & Zeldes LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

*Counsel for Plaintiffs,*
*JOFAMA COLEMAN AND*
*JOCELYNE COLEMAN.*